Marshall, C. J.
The two above-entitled error proceedings from the public utilities commission were argued together in this court, and, in fact, error was prosecuted from separate orders of the commission made in a consolidated cause. The proceedings above entitled are based upon objections to two several orders made in that cause, the first affecting rates on road building materials, the second, on sugar beets. The essential legal questions in both proceedings are the same. The orders were made, respectively, on the following dates, September 29, 1921, and October 7, 1921.
*555 These orders cannot be logically discussed or even intelligently stated without a review of the rates which heretofore prevailed and the conditions of the carriers before, during and since federal control.
For many years prior to the war the commissions had been so parsimonious in their rate regulations that the transportation systems of the country had not been able to develop their facilities and equipment or to make extensions commensurate with the general development of the country. After the world war was begun the impetus thereby given to business greatly emphasized the deficiencies of transportation and made it necessary to resort to federal control and governmental financial aid and credit. Almost immediately after assuming control, for reasons not necessary to discuss or even inquire, it was found necessary to greatly increase rates, and such increases were not made pursuant to the research upon which the rate structure had thereto.fore been founded, but rather with a view to raising necessary revenue, and, perhaps, with certain economic considerations in mind. While several orders provided for certain percentages of increase over existing rates, upon many commodities rates were arbitrarily advanced, without regard to cost, former rate, or length of haul, and the true sense of proportion between related commodities was in some instances disregarded.
All these matters could be endured during the business disturbances incident to the war, but in an effort to return to normal conditions it is imperative that if any iniquities or inequalities exist they should be corrected. If any arbitrary changes were dictated by considerations of temporary expediency, *556 and if at the present time business is thereby hampered and normal conditions delayed, the situation challenges the earnest consideration of courts and commissions.
Notwithstanding the fact that by successive orders of the president and the commission rates had been greatly increased, the railroads continued to be operated with a large deficit. When the Transportation Act of February 28, 1920, was enacted, which provided for termination of federal control, congress recognized the fact that the equipment of the carriers was so impaired, and their credit and income so demoralized, that unless further aid and assistance should be furnished none of them would be able to meet the requirements of transportation and many of them would be forced into bankruptcy.
Provision was therefore made in that act for refunding their obligations to the United States, and for a guaranty of 6% income for six months, and for loans out of a revolving fund for a period of two years, and under Section 422 of the Transportation act of 1920 (41 Stat. at L., 488), enacting supplemental Section 15a of the Interstate Commerce Act, it was provided that the commission should establish rates which would earn a fair return upon the aggregate value of property used and useful in transportation, and that the commission should from time to time determine what percentage would constitute a fair return, but “That during the two years beginning March 1, 1920, the Commission shall take as such fair return a sum equal to 5% per centum of such aggregate value,” etc., with % of one per cent, for improvements.
*557 Pursuant to the power so granted, the commission made an investigation as to rates and charges, known as Ex Parte 74, reported in 58 I. C. C., 220, under date of July 29, 1920. The eountry was divided into three groups, with Ohio in the eastern group. The aggregate value of the properties was fixed at $18,900,000,000, the value of the eastern group being placed at $8,800,000,000. In the eastern group, the freight rates then existing were ordered increased 40%. The Ohio commission approved similar increases in all freight rates in intrastate commerce. The orders became effective August 26, 1920. The record of this ease fairly shows that instead of this large increase producing the revenue to pay 5%% on aggregate value, plus %% for improvements, it in fact resulted in earning only a net rate of 1 8/10%. It is quite certain therefore that the carriers were either entitled to increased revenues or that they were chargeable with failure to employ proper economy of operation. It is difficult to see how they could exercise greater economy, because materials and equipment are regulated by current markets, and the price of labor is fixed by the labor board.
While it is clear that under the law as well as upon sound economic principle the carriers are entitled to greater net earnings, it is not so clear that this result can be brought about by the simple expedient of increasing rates and charges. It is plainly evident that any effort to maintain a percentage of earnings upon aggregate value of property used and useful must depend upon the volume of the traffic and the rate charged, and that to earn a percentage of the value of equipment it is necessary to *558 keep the entire equipment in useful operation, a condition which can only occur when business conditions are sound and all lines of business free from handicap. It is true that as to certain essential commodities, the volume will not be much reduced, but the great bulk of commodities entering into transportation will be found to be more sensitive to cost of transportation service. Certain lines of business have been very dull, and certain commodities have not moved in transportation, and it is possible and indeed probable that the rate is greater upon some commodities than the traffic will bear; and it may also be true, as charged in this controversy by shippers, and as found by the commission, that unjust preferences and discriminations have crept into the rate structure, not only as between certain related commodities but also as between rates made upon the same commodities in different states.
The orders of the commission now under review were made in an investigation, upon its own motion, of certain freight rates and charges then in effect in intrastate traffic in Ohio, to determine whether they were unreasonable and unjustly discriminatory.
In the hearings before the commission, and again in these error proceedings in this court, counsel for the carriers challenged the jurisdiction of the commission to make the orders, on the ground that the interstate commerce commission, in Ex Parte No. 74, 58 I. C. C. Rep., 220, had made an order allowing a horizontal increase of 40% in interstate rates, and the same order involved a finding that those rates were necessary to carry into effect the mandate of congress relative to providing specified percentages of returns to carriers. It is further pointed out *559 that the interstate commerce commission has never made any change in those rates in so far as Ohio is concerned, and that the state commission has no power to do so without at the same time making compensatory increases to offset any reductions. We are thus brought face to face with the question of the power of congress and the regulatory power of the interstate commerce commission over freight rates and charges on transportation between points wholly within a state.
The jurisdiction of the interstate commerce commission and also the jurisdiction of the supreme court of the United States to hear and determine any controversy affecting transportation rates of common carriers is derived from legislation authorized by Section 8, Article I of the Federal Constitution, which gives congress power “To regulate Commerce with Foreign Nations, and among the several States, and with the Indian Tribes.”
The power thus conferred was imperatively demanded by the economic conditions and jealousies existing and reprisals being exacted by the states in their growing hostile relations toward each other following the war of independence, prior to the adoption of the federal constitution, and those conditions probably constituted the strongest factor in bringing about the framing and adoption of the federal constitution.
The necessity for regulation of commerce was emphasized by Hamilton in the Federalist as one of the strongest reasons for union; and it was the uppermost consideration- in the minds of those who were instrumental in bringing about the constitutional convention; and was the most effective argu *560 ment in favor of nationalism and against paramount sovereignty of the states.
In the case of Houston, E. & W. Texas Ry. Co. v. United States, 234 U. S., 342, generally referred to as the Shreveport case, it is stated that the object of the commerce clause was to prevent interstate trade from being destroyed or impeded by the rivalries of local governments. While from a historical as well as a judicial point of view we must recognize the force of that statement, and while' we profoundly respect the eminent tribunal which gave it utterance, may it not be said with equal force that the object of the adoption of Article X of the Amendments to the Federal Constitution, which provides “the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people,” was to preserve to the states the right to protect intrastate trade from being destroyed or impeded by the rivalries of other states of the Union?
In the same ease, at pages 355 and 356, after quoting the broad powers of the interstate commerce commission as conferred by Section 3 of the Act to Regulate Commerce, passed February 4, 1887, Justice Hughes makes this observation: “This language is certainly sweeping enough to embrace all the discriminations of the sort described which it was within the power of Congress to condemn.”
The first section of that act contains the following: “Provided, however, that the provisions of this act shall not apply to the transportation of passengers or property, or to receiving, delivering, storage, or handling of property, wholly within one State,” etc.
*561 Again, at page 357, Justice Hughes makes the further observation: “Congress thus defined the scope of its regulation and provided that it was not to extend to purely intrastate traffic. It did not undertake to authorize the Commission to prescribe intrastate rates and thus to establish a unified control by the exercise of the rate-making power over both descriptions of traffic. Undoubtedly — in the absence of a finding by the Commission of unjust discrimination — intrastate rates were left to be fixed by the carrier and subject to the authority of the States or of the agencies created by the States.”
The principles declared and applied in the Shreveport case have been approved in later cases: American Express Co. v. State, ex rel. Caldwell, Atty. Genl., 244 U. S., 617, and Illinois Central Rd. Co. v. State Public Utilities Commission of Ill., 245 U. S., 493. After these cases were decided congress enacted their principles into statute law in Section 416 of the Transportation Act of 1920, amending Section 13 of the Interstate Commerce Act by adding paragraph 4, from which we quote, in part:
“Whenever * * * the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, * * * it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum thereafter to be charged, ’ ’ etc.
*562 In the ease of Railroad Commission of Wisconsin v. Chicago, B. & Q. Rd. Co., 42 S. C. Rep., 232, decided by the supreme court of the United States February 27, 1922, the court again discussed and reaffirmed the same principles, and. also discussed the above-quoted provisions of the Transportation Act of 1920.
There are, however, some earlier cases which are not in conflict with and not overruled by the later eases, or the statutes, which help to clarify the relations between state and interstate authority.
In Gibbons v. Ogden, 9 Wheat. (22 U. S.), 1, at page 195, Chief Justice John Marshall, though an uncompromising federalist, made the following declaration: “The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which da not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government. The completely internal commerce of a State, then, may be considered as reserved for the State itself.”
The opinion in the Minnesota Rate cases, 230 U. S., 352, also concedes the authority of the states over their internal concerns.
If commerce within a state and commerce across state boundaries are so interwoven and commingled that one subject cannot be dealt with or even considered separate and apart from the other, then the contention of the carriers is sound, but so long as intrastate commerce has a recognized existence there must *563 be some proper and legal function to be performed in relation thereto by the state commission.
The federal power is supreme and almost unlimited in all commercial relations “among the states,” but must find a very distinct limitation whenever it seeks to control commerce within the territorial limitations of our state.
It has been found that there is a well-defined and inseparable relation between “commerce among the states” and commerce within the states, and it has frequently been found that this relation has caused a serious difficulty in fixing rates to compensate the two classes of service while at the same time avoiding discriminations of each against the other. These troublesome problems have several times engaged the earnest thought of the federal courts and congress, and while, on the one hand, as a general proposition, the commerce wholly within a state has been recognized as immune from federal regulation, on the other hand the general power of the federal government to foster and protect interstate commerce and to prevent injury thereto is extensive and comprehensive enough to authorize all measures necessary or appropriate to that end, even though intrastate transactions of interstate carriers may thereby be controlled.
This power can only be exercised by the interstate commerce commission in a definite, specific, precise order. In the case of American Express Co. v. Caldwell, supra, we find this expression, at page 627: “In cases of this nature, where the dominant federal authority is exerted to affect intrastate rates, it is desirable that the orders of the Interstate Commerce Commission should be so definite as to the rates and *564 territory to be affected as to preclude misapprehension. If an order is believed to lack definiteness an application should be made to the Commission for further specifications.”
The same principle is declared and followed in Illinois Cent. Rd. Co. v. Public Utilities Commission, supra. Applying that principle to the order made in Ex Parte No. 74, it will be found that that order was not a definite, specific order fixing rates and charges between specified points, but a general order affecting interstate rates and applying to general conditions, and that it was not intended to, and did not in terms, establish freight rates and charges between points within any state. It was not based upon a careful study of specific local conditions, or the relative claims of specific commodities, but was a sweeping, general order designed to meet an emergent situation. The character of the order is shown by the language of the opinion, at pages 255 and 256:
“Most of the factors with which we are dealing are constantly changing. It is impossible to forecast with any degree of certainty what the volume of traffic will be. The general price level is changing from month to month and from day to day. It is impracticable at this time to adjust all of the rates on individual commodities.”
Thus it was recognized that inequalities and unjust conditions would develop, and that “changes” would be inevitable, and the readjustments foreseen to be necessary two years ago have now become imperative.
Notwithstanding the declarations of four important cases decided by the supreme court of the United States, and notwithstanding the provisions *565 of the Transportation Act of 1920, a careful analysis of those decisions and the statute must compel the conclusion that the primary power of establishing intrastate rates remains with the state commissions, subject only to the paramount authority of the inter7 state commission to make a certain, specific order effecting changes on the ground of discrimination against interstate commerce, and that in correcting discrimination the interstate commission may establish intrastate rates.
While the jurisdictional question is an important one, no conflict is apparent in this controversy, because the Ohio commission in the three orders under review herein has made changes only in intrastate rates heretofore established by it, in August, 1920.-
The conclusion must therefore be reached that the Ohio commission has jurisdiction to make this voluntary investigation, and to make orders which would properly respond to the evidence adduced, and this court can only determine whether its orders were reasonable and lawful.
If the execution of these orders will operate as a discrimination against interstate commerce, the inquiry can only be made in a proper proceeding before the interstate commission.
This principle was recognized in the Minnesota Rate Cases, supra, at pages 419 and 420, from which we briefly quote:
“The dominating purpose of the statute was to secure conformity to the prescribed standards through the examination and appreciation of the complex facts of transportation by the body created for that purpose; and, as this court has repeatedly held, it would be destructive of the system of regula *566 tion defined by the statute if the court without the preliminary action of the commission were to undertake to pass upon the administrative questions which the statute has primarily confided to it.”
In the rather recent case of C., M. & St. P. Ry. Co. v. State Public Utilities Commission of Illinois, 242 U. S., 333, the court was quite clear on this point: “An order of a state commission fixing a rate for transportation in purely intrastate commerce will not be disturbed upon the grounds that it produces discrimination against interstate commerce, interferes with administrative provisions of the Interstate Commerce Act, and intrudes upon the jurisdiction of the Interstate Commerce Commission, where the relations of the rate fixed to interstate commerce have not been determined by the Interstate Commerce Commission and are not established by the evidence, and where the certainty that it will operate to the injury of those engaged in such commerce is not made to appear.”
The same principle was recognized in an earlier case, B. O. Rd. Co. v. United States, ex rel. Pitcairn Coal Co., 215 U. S., 481, as follows:
“Regulations which are primarily within the competency of the Interstate Commerce Commission are not subject to judicial supervision or enforcement until that body has been properly afforded an opportunity to exercise its administrative functions.”
The Wisconsin Passenger Fares Case, supra, is not in conflict with these views, because in that case the interstate commerce commission had made a full inquiry, a finding of discrimination, and a definite, specific order.
*567 Since the argument of these cases in this court the interstate commerce commission has made substantial reductions in rates upon many commodities, and such action on its part must necessarily lend some sanction to the action of the Ohio commission, and it is common knowledge that the cost of labor and materials entering into the operation of railroads has been materially reduced.
It follows from what has already been stated that the commission had jurisdiction over the subject-matter of the action and further that this court may only inquire in these error proceedings whether the findings of fact properly support the orders made.
From the facts found in cause No. 17269, relating to road materials, we quote:
“The testimony showed that in a number of instances the high level of freight rates on this material was developing the trucking industry for short hauls and opening up many new local pits and quarries throughout the State, resulting in curtailment of the business of established producers and proving disastrous to both the shipper and carrier alike; that in many cases account of the high freight rates, the contractors were using a much lower and inferior grade of material from local pits and quarries in preference to the higher grade which could be secured from established pits and. quarries at more distant points by rail transportation. Thereby resulting in loss of revenue to the carriers and in the construction of highways below the standard desired.
“The evidence adduced and exhibits submitted indicate convincingly that the present freight rates in Ohio on sand, gravel and crushed stone are consid *568 erably higher than those prevailing in the neighboring states of Michigan, Indiana and Illinois. Also that Ohio intrastate rates on these commodities are on a higher level than those applying on interstate traffic between Ohio and neighboring states and higher than interstate rates between Indiana and Michigan and between Indiana and Illinois. Furthermore that there are no transportation conditions in Ohio that warrant freight rates on these commodities in excess of those now in effect in the states mentioned. ’ ’
Numerous exhibits were submitted by the paving block interests, all tending to show that paving block has been seriously handicapped by reason of the 40 cents per ton arbitrary increase under general order No. 28, and that with the 40% added under I. O. O. Ex Parte 74 the present rates are considerably higher than the traffic will bear and move freely to most destinations within the state of Ohio. .
The commission therefore established the rate on sand, gravel and crushed stone by taking off the 40% added under Ex Parte 74, and reduced the rate on paving block in the same mode and also took off the further sum of ten cents per ton. It should require no analysis to show that the facts found indicate that the fotmer rates were both unreasonable and discriminatory.
From the facts found in cause No. 17276, relating to sugar beets, we quote:
“The record shows that the mileage scale rates applying on sugar beets in the states of Colorado, Utah, Minnesota, Iowa, Nebraska and Wisconsin are considerably lower than those applying in Ohio on the same commodity.
*569 “The record shows that while freight rates on sugar beets have been increased since 1915 over 100%, the price of sugar has not only returned to the pre-war level but has fallen below it, and the sugar companies are now operating at a loss, and it is claimed by the complainants that unless a reduction in freight rates can be effected, certain plants will be compelled to go out of business.”
The commission therefore established rates on sugar beets practically the same as those in effect prior to the 40% increase made under Ex Parte 74. Here also the facts found will support the order of the commission.
The orders of the commission in both cases will therefore be affirmed.

Orders affirmed.

Johnson, Hough, Wanamaker, Robinson, Jones and Matthias, JJ., concur.